Filed 9/16/13  P. v. McGraw CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CALVIN McGRAW,<br><br>  Defendant and Appellant. | 2d Crim. No. B236410<br>(Super. Ct. No. MA049580)<br>(Los Angeles County) |

Calvin McGraw appeals the judgment entered following his conviction by jury of (1) corporal injury to a former cohabitant (Pen. Code, § 273.5, subd. (a)),[1] with a special finding that appellant used a chair as a deadly weapon (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury (§ 12022.7, subd. (e)); and (2) assault with a deadly weapon (§ 245, subd. (a)(1)), with a special finding of infliction of great bodily injury.  Appellant waived jury on the prior conviction allegations and the trial court found them to be true.  It sentenced appellant to an aggregate prison term of 22 years.

Appellant contends the trial court erred by finding no prima facie case of discrimination during voir dire, by failing to instruct the jury sua sponte with CALCRIM No. 850 and by denying appellant's motion to reopen the evidence.  He further contends trial counsel provided ineffective assistance of counsel by not objecting to inadmissible

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

expert evidence as to the victim's credibility and by failing to request the CALCRIM No. 850 limiting instruction. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Antoinette Watkins, who were in an "on and off" romantic relationship for 30 years, began living together in 2006. At 1:45 a.m. on June 20, 2010, Watkins called 9-1-1 to report an "emergency." She said that appellant "beat [her] all in [her] face," causing so much swelling she could "barely see." Repeatedly naming appellant as her assailant, she said they started fighting because "Shawn" had sent a text message to her phone. Watkins said that appellant "beat me with a chair."

When Watkins saw the condition of her face later that morning, she went to the sheriff's station. The deputies photographed her injuries, which included two black eyes, a cut to her cheek requiring two stitches, a cut on her arm and a fractured elbow. They also called an ambulance to take her to the hospital, where she was interviewed by Deputy Sheriff Robert Claus. Watkins told him appellant had inflicted the injuries to her eyes and face. She explained that after she received a text, appellant got angry and warned, "I am going to beat your ass." He took a chair and beat her with it in the head and upper torso, causing her to lose consciousness. Watkins' son arrived and fought with appellant, who left the house.

Two days later, Watkins was interviewed on videotape by Detective Lisa Ashworth. Watkins was ambivalent about the incident. She said that after appellant threatened to kick her out of the chair, "I got up and I grabbed the chair. I don't remember if I hit him first. I might have, he says I always hit him first. I might have hit him first because he approached me. [¶] Because if he approached me I might have hit him first." She said she thought her eye injury came from a fist, not the chair, "because all [she] felt was fists." Watkins stated that after she called the police, her son started fighting with appellant. She said she bit appellant during this fight.

Watkins went to live with her son. A few months later, she moved to California City, where she and appellant resumed their relationship. She did so because she loved him.

Before appellant's trial, Watkins was placed in custody because she refused to testify. When she did testify, she said that she did not want appellant to "get in trouble." Watkins acknowledged she made the 9-1-1 call shortly after receiving her injuries, but said she lied when she told the operator that appellant had beat her with a chair. Watkins testified that she "busted [appellant] in the head with a chair" because she was jealous of another woman. She explained that before the fight, they were drunk and playing dominoes, and that she hit him first, causing the wooden chair to break into pieces. She said the next thing she knew, she was standing up and "everything was quiet and over." She did not remember getting hit or how she got her injuries.

Watkins testified that after she hit appellant with the chair, she tried to stab him with a knife. She said that after appellant returned to the residence, her adult son jumped on him and she started biting appellant. She testified that during her interview with Detective Ashworth, she said she hit appellant with the chair and that she hurt her arm while punching appellant and "sliding in the water" on the floor. Watkins testified she was sure she hit appellant first. The audio and video tapes of the earlier interview were played to the jury.

Watkins denied telling Deputy Claus that appellant had hit her with a chair. Watkins explained that during the incident her bipolar condition "kicked in" and she became very irritated. She stated that if she drinks while on her bipolar medication, as she was at the time of the incident, it does not work and she gets irritable and violent. She said she is schizophrenic, and described a situation in Memphis where she hit appellant with a car. She testified that she hits people first "quite often."

Shortly after the incident, Watkins told her sister Lisa that appellant had caused her injuries and that she was not going back to him. Lisa testified she did not like appellant because he beat her sister. Lisa said that whenever she told Watkins to leave appellant, Watkins always said "she's not going to take him back, for the kids, and she's tired of dealing with him." But then Watkins would "take[] him back every time."

Lisa stated that Watkins told her that she was going to testify against appellant, but that "eventually changed." Watkins informed Lisa that she was not going

to court and that she keeps going back to appellant because he was her childhood sweetheart. Lisa recalled that Watkins also was the victim of domestic violence in another relationship.

Appellant did not testify or present any other evidence on his own behalf.

*Subsequent Confrontation*

After appellant and Watkins had reconciled, and before trial, California City Police Officer Jesse Hightower responded to a 9-1-1 call of a man chasing his family with a knife. When the officer arrived at the scene, Watkins told him that appellant became angry when she called his friend's wife a bitch. Appellant went into the kitchen to get a knife. Watkins and her daughter jumped out of the bedroom window and ran to a neighbor's house for help. Watkins saw appellant pacing outside their home with what appeared to be a six-inch knife in his hand. She told the officer she thought appellant was going to kill her. This incident resulted in appellant's conviction for brandishing a deadly weapon.

At trial, Watkins denied that she told Officer Hightower that appellant had chased her with a knife. She said "nothing happened," and that she lied about the knife because she was still mad at him about the June 2010 incident and wanted the police to take him to jail. She did admit that she and her daughter had jumped out of the window and had run to the neighbors' house. She testified she was afraid they were going to have another fight, not that she was afraid appellant was going to kill her.

*Expert Witness Testimony*

Detective Lisa Ashworth testified as a percipient and expert witness. Based on her experience, she testified that victims of domestic violence may recant and generally are not cooperative with the prosecution. She explained that domestic violence victims may blame their abusers immediately after the incident, but within a short time they will decide they do not want to testify against them. She noted that some victims return to their abusers for a wide variety of reasons, ranging from financial dependence, to fear, to love.

4

Detective Ashworth observed that the differences between Watkins' description of the incident to Deputy Claus and her June 22 interview with Detective Ashworth were indicative of the minimizing behavior of persons who report domestic abuse. She testified that Watkins' conduct in initially blaming appellant, but later blaming herself, was "consistent with" that of a recanting witness. The detective further opined, in response to questioning from the prosecutor, that Watkins was a "recanting victim."

DISCUSSION

*Batson/Wheeler Motion*

Appellant, who is African American, contends the prosecution violated his constitutional rights by using its peremptory challenges to exclude from the jury a cognizable group of minority women (one African American and three Hispanic women). The result, appellant contends, was a jury lacking African American and Hispanic representation.

"[U]se of peremptory challenges to strike prospective jurors on the basis of group bias -- that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds' -- violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution" and "the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 541, citing *Batson v. Kentucky* (1986) 476 U.S. 79, 88 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*).)

Where, as here, a defendant challenges the prosecution's use of peremptory challenges by way of a *Batson*/*Wheeler* motion, he or she must comply with the following procedures. "'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] . . .'" (*People v. Williams* (2013) 56 Cal.4th 630, 649.) Second, if the defendant succeeds in making this prima facie case, "'. . . the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral

5

justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."'  (*Johnson v. California* (2005) 545 U.S. 162, 168.)"  (*Williams,* at p. 649; see also *People v. Johnson* (1989) 47 Cal.3d 1194, 1216.)

The prosecution used a peremptory challenge to strike Juror No. 10, an African American administrative assistant with an ongoing "DUI" case.  Appellant objected that she was one of only two African Americans in the initial 35-member jury panel and that there was no indication from voir dire that she could not be fair.  The trial court determined that the excusal of one of the two African Americans did not demonstrate a prima facie case of discrimination.  Nonetheless, the prosecutor volunteered that Juror No. 10 was "the only one with the open DUI here in the Antelope Valley."

The prosecution also excused three Hispanic women:  Juror No. 12, a medical biller whose husband was twice convicted of assault with a deadly weapon; Juror No. 14, a full-time nursing student; and Juror No. 30, a full-time student studying to become a social worker.  Appellant interposed a second *Batson/Wheeler* objection, claiming the prosecution was systematically excusing "women of ethnic background."  The trial court again determined the defense had not made a prima facie case of discrimination.  The court observed that Juror No. 12's husband had been convicted twice of assault with a deadly weapon.  The court noted that Juror No. 30 was living at home, that her mother was a nursing student and that the juror herself was a full-time student studying to become a social worker.  The court found that because of her work and her mother's nursing ties, the juror "may be sympathetic to victims . . . exposed to injuries, and having to deal with those things involving domestic violence because of the nature of the work and what her studies are."  The court made the same finding regarding Juror No. 14, due to her full-time nursing studies.  The court concluded: "On their face, [the challenges] don't appear to be a systematic elimination of any particular race.  [¶] Counsel has excused as far as race is concerned total, four whites, four Hispanics, and one African-American out of the nine.  [¶]  As far as the nine peremptories, there's been

6

six females and three males excused. [¶] And I don't see a prima facie showing that would warrant the justification for the People to respond."

As the People point out, race-based discrimination is difficult to show from a small number of challenges. In *People v. Taylor* (2010) 48 Cal.4th 574, 642-643 (*Taylor*), the prosecution used three of its ten peremptory challenges to excuse one Hispanic and two African-American prospective jurors. The court concluded that "[s]uch evidence, without more, is insufficient to create an inference of discrimination, especially where, as here, the number of peremptory challenges at issue is so small. [Citations.]" (*Id.* at p. 643.) Furthermore, reviewing courts may consider "obvious race-neutral reasons for the excusal" of the prospective jurors in question. (*Id.* at p. 644.)

Conceding "objective race-neutral reasons for excusing [prospective] Juror Nos. 10 [ongoing DUI] and 12 [husband with history of assault]," appellant asserts that no such reasons existed for striking the aspiring social worker and full-time nursing student. We disagree. The record of voir dire evidences obvious race-neutral reasons for striking both jurors. In *Taylor, supra,* 48 Cal.4th at page 644, the court determined that the record not only failed to support an inference of discrimination, but it also showed obvious race-neutral reasons for the excusal of the prospective jurors in question. Noting that the juror questionnaires revealed that one of the prospective jurors was a probation officer and another was a nurse, the court determined that "both were engaged in professions the prosecutor reasonably could believe would tend to make them overly sympathetic to the defense." (*Ibid.*; see *People v. Reynoso* (2003) 31 Cal.4th 903, 924–925 [prosecutor may excuse prospective juror based on belief that juror's occupation renders him or her ill-suited to serve on that case].) Here, the trial court reasonably concluded that full-time students studying nursing and social work fall within the same category.

We conclude appellant failed to satisfy his burden of showing an inference of discrimination, and that the totality of the facts supports the trial court's denial of his *Batson/Wheeler* motion. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 993-994.)

7

*Ineffective Assistance of Counsel*

Appellant contends he was denied his state and federal constitutional rights to effective assistance of counsel because his trial counsel failed to interpose the correct objections to Detective Ashworth's expert testimony: first, as to the prosecutor's alleged misconduct in eliciting testimony in violation of the trial court's limiting instruction and, second, by permitting the admission of improper expert testimony as to Watkins' credibility. We are not persuaded.

Before Detective Ashworth was qualified to testify as an expert witness, the prosecutor stated his intent to limit her testimony to "recanting victims" in domestic violence cases. The trial court then asked the witness: "And you understand if you are allowed to testify, you couldn't talk about this particular victim or any opinions as to why she herself may be recanting?" Detective Ashworth responded: "That's correct."

Detective Ashworth testified about the generic patterns of behavior associated with victims of domestic violence, including their tendency to recant their accusations against the abuser, to minimize the events, to blame themselves and to become uncooperative with police. When the prosecutor asked about her interview with Watkins, the detective responded: "The story, she already began to minimize the incident." When the prosecutor asked her to explain what she meant by "minimize," the defense attorney objected, citing expert testimony and hearsay, and requested a sidebar. The trial court overruled the objections.

Thereafter, Detective Ashworth testified that Watkins' behavior was consistent with a recanting victim in that she minimized the event, changed her version of events after the 9-1-1 call and initial interviews and started taking the blame to protect appellant. The prosecutor then asked: "Based on your practical experience and the information in your investigation of this case involving Antoinette Watkins, do you have an opinion as to whether Antoinette Watkins is a recanting victim?" She responded: "Absolutely."

An expert generally may not give an opinion as to whether a witness is being truthful because the determination of credibility is not a subject sufficiently beyond

8

common experience that the expert's opinion would assist the trier of fact. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 (*Coffman*).) But the court may allow "expert testimony to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight." (*People v. Ward* (2005) 36 Cal.4th 186, 211.)

The trial court admitted Detective Ashworth's testimony that persons who report domestic abuse often recant the accusation, finding that it was not common knowledge. Appellant contends the court erred, however, in admitting her testimony that Watkins was a "recanting victim." In *Coffman, supra,* 34 Cal.4th at page 82, the court observed that an "expert may not testify about rape trauma syndrome, a condition analogous to battered woman syndrome, in order to prove that a rape actually occurred," but noted that "such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault -- such as a delay in reporting it -- was inconsistent with her claim of having been raped." The court explained that while an expert may discuss, "with reference to her expert knowledge, certain aspects of [a victim's] behavior that a layperson might find irreconcilable with her claim to have been battered," the witness may not testify that "she believed [the victim's] claims of abuse and domination . . . were true." (*Ibid.*, fn. omitted.)

Detective Ashworth did not testify that Watkins' initial reports of abuse were true. Nor did she testify that Watkins' trial testimony was false. Rather, she testified that Watkins' subsequent disavowal of her earlier statements was consistent with the detective's experience of witness recantation in domestic abuse cases. Because the detective did no more than explain that, in her experience, certain aspects of Watkins' behavior are reconcilable with her claim of domestic abuse, the trial court appropriately allowed the evidence. (*Coffman, supra,* 34 Cal.4th at p. 82; see *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300, 1302 [expert testimony regarding failure of parent of child molestation victim to promptly report abuse].)

The prosecutor did not commit misconduct by soliciting the detective's opinions, and thus the derivative claim of ineffective assistance of counsel fails. (See *People v. Marshall* (1996) 13 Cal.4th 799, 832 [ineffective assistance claim fails upon

9

failure to establish prosecutor's misconduct].) Moreover, to prove ineffective assistance, a defendant must show there is a reasonable likelihood the result would have been different absent counsel's alleged deficient performance. (*Strickland v. Washington* (1984) 466 U. S. 668, 687, 690-694 (*Strickland*).) Appellant fails to make this showing.

That Watkins was a "recanting victim" is apparent. The jurors heard her initial allegations -- as described in her taped 9-1-1 call and in her interviews with Deputy Claus and Detective Ashworth -- and saw the graphic photographs of her injuries. The jurors also knew Watkins was in custody during trial because she refused to cooperate with the prosecution. When she did testify, she admitted she loved appellant and wanted to protect him. Watkins' sister confirmed that Watkins originally planned to testify but then changed her mind. Detective Ashworth's opinion testimony was not necessary to establish that Watkins was a "recanting victim."

In addition, the trial court properly instructed the jury pursuant to CALCRIM No. 332 that it was not required to accept the expert's opinion. It was the jurors' responsibility to "decide whether information on which the expert relied was true and accurate," and to disregard any opinion they found "unbelievable, unreasonable, or unsupported by the evidence." (*Ibid*.)

### CALCRIM No. 850

Appellant contends that the trial court had a sua sponte duty to give CALCRIM No. 850 -- the pattern instruction concerning testimony on intimate partner battering syndrome and its effects as to the credibility of the complainant -- and that its "failure" to do so was prejudicial error.[2] Appellant claims that without the instruction,

---

[2] CALCRIM No. 850 states: "You have heard testimony from <insert name of expert> regarding the effect of (battered women's syndrome/intimate partner battering . . .). [¶] _____'s <insert name of expert> testimony about (battered women's syndrome/intimate partner battering . . .) is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not _____'s <insert name of alleged victim of abuse> conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of (his/her) testimony."

10

there was nothing to prevent the jury from using Detective Ashworth's expert testimony as affirmative evidence of appellant's abuse.

Evidence Code section 355 provides that "[w]hen evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." "[A]bsent a request by defendant, the trial court has no sua sponte duty to give a limiting instruction." (*People v. Macias* (1997) 16 Cal.4th 739, 746, fn. 3 (*Macias*); *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316 (*Jennings*).)

Appellant acknowledges that Detective Ashworth's expert testimony was "admissible . . . for one purpose and [was] inadmissible . . . for another purpose" within the meaning of Evidence Code section 355.  Because he did not request a CALCRIM No. 850 limiting instruction, the court had no duty to give one.  (*Macias, supra*, 16 Cal.4th at p. 746, fn. 3; *Jennings, supra*, 81 Cal.App.4th at p. 1316.)

Alternatively, appellant contends his trial counsel provided ineffective assistance by failing to request a limiting instruction.  We agree that a CALCRIM No. 850 instruction would have been appropriate based on the evidence, but appellant has not demonstrated that his counsel's decision not to request the instruction was prejudicial.  The prosecution presented substantial independent evidence from which a rational jury could have found that Watkins' initial allegations regarding appellant's conduct were truthful and that she subsequently recanted them to protect appellant.  Appellant has not, and cannot, meet his burden of showing a reasonable probability he would have obtained a more favorable result but for his counsel's failure to request the instruction.  (See *Strickland, supra,* 466 U.S. at p. 694.)

*Motion to Reopen Evidence*

After the trial court had instructed the jury and the prosecutor had given his opening argument, appellant moved to reopen the evidence to introduce a CD ROM of 31 photographs supposedly showing the injuries Watkins inflicted on him during the incident.  The photographs, purportedly taken by appellant's sister, were date-stamped June 21, 2010, and appeared to depict an abrasion on the right side of his neck,

11

lacerations to his right arm, back, right ear and right eye, and bite wounds on his arm and back. The trial court denied the motion, saying that appellant knew about the photographs when they were taken the year before.

A trial court has broad discretion to reopen a case to allow additional evidence. (§§ 1093, subd. (d), 1094; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1520.) To assess whether the trial court abused that discretion, we consider four factors -- the stage of the proceedings at the time of the motion to reopen, the defendant's diligence in presenting the new evidence, the prospect that the jury would give undue emphasis to the new evidence and the significance of that evidence. (*People v. Jones* (2003) 30 Cal.4th 1084, 1110; *Funes*, at p. 1520.)

The late stage of the trial and appellant's lack of diligence in proffering the evidence supported the trial court's decision, as did the prospect that reopening the case at that stage would give undue emphasis to the photographs. (See *People v. Jones, supra,* 30 Cal.4th at p. 1110; *People v. Funes, supra*, 23 Cal.App.4th at p. 1520.) The probative value of the photographs also was questionable. (*Ibid*.) As the trial court observed, "[t]he victim [Watkins] has already stated that she was physically abusive with the defendant in the past. You were able to bring that in. You also brought in the information about Tennessee and that was brought in, you have that information that the victim had a propensity for violence and brought before the jury." Indeed, Watkins testified that after the incident with the chair, her adult son attacked appellant and she started biting appellant. The photographs would have been cumulative to the extent they corroborated that testimony.

*Cumulative Error*

Appellant contends the cumulative effect of the purported errors deprived him of a fair trial. Having rejected his contentions on appeal, we also reject his claim of cumulative error. "There was . . . no error to cumulate." (*People v. Phillips* (2000) 22 Cal.4th 226, 244.) And, to the extent there was any error, appellant was not prejudiced

12

thereby.  (*People v. Jenkins, supra,* 22 Cal.4th at p. 1056.)

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

13

Daviann L. Mitchell

Superior Court County of Los Angeles

_____

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Louis W. Karlin, Deputy Attorney General, for Plaintiff and Respondent.